UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LESLIE K. WASSON, | ) | 1:04cv6628 DLB |
| | ) | |
| Plaintiff, | ) ) ) | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| v. | ) ) | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) | |
| | ) ) | |
| Defendant. | ) | |

**BACKGROUND**

Plaintiff Leslie L. Wasson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for period of disability, disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On April 13, 2005, the Honorable Oliver W. Wanger reassigned the case to the undersigned for all purposes.

1

**FACTS AND PRIOR PROCEEDINGS[2]**

Plaintiff filed her application on April 17, 2002, alleging disability since December 28, 2001, due to "chronic anxiety and depression." AR 65-67, 83-92, 252-254. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 50-53, 55-58, 59-60. On September 19, 2003, ALJ Patricia Flierl held a hearing. AR 262-286. On November 20, 2003, ALJ Flierl found that Plaintiff was not disabled. AR 14-24. On October 26, 2004, the Appeals Council denied review. AR 5-9.

Hearing Testimony

ALJ Flierl held a hearing on September 19, 2003, in Fresno, California. Plaintiff appeared with her attorney, Allan Cohan. Vocational expert ("VE") Judith Najarian also appeared and testified. AR 262.

Plaintiff testified that she was 48 years old at the time of the hearing and completed high school and four years of college. AR 265. She was not married and did not have children. AR 285.

Plaintiff delivered newspapers for the *Hanford Sentinel* from April to December 2002. AR 265-265. This was her last job, performed after her application for benefits AR 265. She left this position because she argued with customers. AR 266. Plaintiff explained that she also got into an altercation with a woman on a bicycle while employed with the *Hanford Sentinel*. AR 267.

Plaintiff reviewed her many other positions and indicated that she left those positions because she either argued with supervisors or the public, had too many complaints against her, or missed too much work. AR 268-274.

Plaintiff was in the naval reserve for eight years and in active duty for four years. AR 273. She received bad evaluation marks during her service. AR 273.

When questioned by her attorney, Plaintiff explained that other than wearing glasses, she had no physical problems. AR 275. As for mental problems, she testified that her psychiatrist

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

told her that she has a personality disorder and has trouble getting along with other people. AR 275. She also has depression, anger problems, antisocial behavior and anxiety attacks. AR 275. She has anxiety attacks a couple of times per week, depending on how depressed she is. AR 279. She described her depression as a "vicious circle." She gets depressed because she can't hold a job, which leads to more depression. AR 275-276. She isolates herself from people and doesn't spend a lot of time outside of her home. AR 276. She hears one voice, but didn't think she hallucinates. AR 276. She has suicidal feelings and came close to killing herself once. AR 276. She wants to hurt other people "only when they push [her] buttons to the point where [she] feels like [she] has to be defensive." AR 276. She gets road rage just about every time she drives. AR 276. She has also had altercations with her neighbors. AR 277.

Plaintiff explained that she has trouble sleeping at night and when she is really depressed, "can't shut off" her mind. AR 277. If she sleeps, her sleep is sporadic. AR 278.

On average, she feels angry four to five times per week. AR 278. She has hit and kicked walls and had broken things against walls. AR 278. She does not deal with stress well and gets enraged easily. AR 278. She doesn't have any patience and has trouble standing in line at the grocery store. AR 279.

She takes medications for her anxiety and depression and also takes an anti-psychotic. AR 279. These medications cause weight gain, memory loss and make her sleepy. AR 279.

Plaintiff explained that she has good days and bad days. On a good day, she may take a shower, go to the store, play with her dog, or watch television. AR 279-280. On a bad day, she has to force herself to get out of bed. AR 280. If she does get out of bed, she is not productive and takes extra medication. AR 280. She just lays around the house and doesn't do much. AR 280. She estimated that 15-20 days of the month were bad days. AR 280. Even on good days, she sleeps because of the medication. AR 280.

She tries to do most of the housecleaning, but her roommate ends up doing half, if not more. AR 281. Her and her roommate share laundry and dishes, but her roommate ends up doing more, especially on bad days. AR 281. Her roommate pays the bills because she doesn't handle money well. AR 281. Plaintiff explained that she would forget to pay the bills and

spend the money. AR 281. Plaintiff gets along with her roommate much better than she gets along with supervisors and co-workers. AR 283.

Plaintiff occasionally goes to church and visits one friend on a regular basis. AR 282.

She testified that she has been receiving counseling and taking medication since 1996. AR 283. Her counseling involves anger management. AR 284.

The VE testified that Plaintiff had a wide variety of past relevant work that ranged from unskilled to skilled and from sedentary to medium. AR 285-286.

<u>Medical Evidence</u>

In February 2001, Plaintiff received treatment from the Department of Veterans Affairs ("VA") for chronic depression, anxiety attacks and attention deficit disorder ("ADD"). AR 146.

Mary Post, L.C.S.W., indicated that she first saw Plaintiff in 1996 for symptoms of anxiety and depression and has seen her "intermittently" since then. AR 150. She last saw Plaintiff on April 19, 2002, when she requested assistance with understanding why she could not hold a job. AR 151. Plaintiff reported that she had about 30 job interviews but was unable to find employment. AR 151. Ms. Post opined that Plaintiff's work-related problems were caused by ADD and requested a second opinion from Avak A. Howsepian, M.D. AR 151.

On April 29, 2002, Dr. Howsepian noted that he spoke with Ms. Post and indicated that he did not share the ADD diagnosis and that Plaintiff's work and interpersonal problems were likely due to "PD [personality disorder] and learning disorder." AR 191.

In May 2002, Ms. Post indicated that Plaintiff's problems with depression and anxiety were chronic and that she did not anticipate recovery. AR 150.

Plaintiff saw Dr. Howsepian on May 23, 2002, and indicated that she was very stressed, especially in light of being laid off in December. She experienced a steep fall in her mood. On mental status examination, she was anxious and depressed. AR 185.

In June 2002, Plaintiff contacted the VA for a refill of her medications. She reported that the Remeron was working well for everything. AR 184.

    Also in June 2002, Plaintiff saw Ms. Post. She was still doing her paper route and had tried to add a second one, but it was too much. She indicated that loud noises make it difficult for her to concentrate. She was sleeping well. AR 224.

    On July 3, 2002, Dr. Howsepian indicated that Plaintiff was "doing better than I have seen her." Her paper route was going well and she was thinking about easing herself back into social work as a researcher. She was sleeping through the night and feeling better on her medication. On mental status examination, her mood was bright. He diagnosed "BPD/NPD [borderline personality disorder/narcissistic personality disorder]," dysthymia, anxiety not otherwise specified, and nicotine dependence. AR 178. Dr. Howsepian noted that Plaintiff should consider weaning from the Prozac.

    On July 11, 2002, State Agency physician Archimedes Garcia, M.D., completed a Mental Functional Capacity Assessment form. He opined that Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, and in her ability to interact with the general public. AR 152-153. Dr. Garcia determined that Plaintiff could understand and remember very short and simple instructions, and could maintain attention and concentration for two hour increments and perform at a consistent pace. AR 154. She could not interact appropriately with the general public due to her depressive symptoms, but could interact appropriately with co-workers and supervisors. AR 154. Plaintiff could respond appropriately to hazards and changes in the workplace. AR 154.

    Dr. Garcia also determined that Plaintiff had mild restrictions in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace. AR 168.

    On September 10, 2002, Ms. Post completed a Mental Impairment Questionnaire. She diagnosed dysthymia, general anxiety disorder, not otherwise specified, learning disorder, not otherwise specified, and personality disorder, not otherwise specified. AR 238. Ms. Post indicated that medications and supportive therapy have been helpful. AR 238. She indicated that Plaintiff was "unable to meet competitive standards" in working with others, performing at a consistent pace and dealing with normal work stress. AR 240. Ms. Post indicated that a

1  routine, repetitive, simple, entry-level position would adversely affect Plaintiff's impairment.
2  AR 243.

3      Plaintiff saw Dr. Howsepian on September 13, 2002, and reported that Remeron was
4  making her more irritable, amotivated and mean. She emphasized her distractability, especially
5  when around other people and her general inattention. On mental status exam, Plaintiff was
6  anxious and hypervigilant. He diagnosed "BPD/NPD," dysthymia, anxiety not otherwise
7  specified, nicotine dependence and rule out ADD. He instructed her to discontinue the
8  Remeron, but continue Prozac and Xanax. AR 173.

9      Also on September 13, 2002, Dr. Howsepian completed a Mental Impairment
10 Questionnaire. He diagnosed a dysthmic disorder, anxiety disorder and personality disorder.
11 He reported a "[m]oderate response to antidepressant medication (Prozac) and antianxiety
12 medication (Xanax); somewhat less depressive & anxiety, but these persist and are disabling."
13 AR 231. He determined that she would be "unable to meet competitive standards" in working
14 with others, completing a normal workday/workweek, responding appropriately to changes in a
15 routine work setting, and dealing with work stresses. AR 233. However, he stated that Plaintiff
16 would not be adversely affected by a "routine, repetitive, simple, entry-level job." AR 236. Dr.
17 Howsepian concluded by explaining that Plaintiff's psychiatric problems are pervasive and
18 "make working at a level commensurate with her training - especially working around other
19 people- impossible for any viable length of time." AR 237. He described her as "very
20 conscientious, highly motivated, but substantially impaired." AR 237.

21      On November 7, 2002, Plaintiff indicated to Dr. Howsepian that her father had died.
22 She was continuing with her paper route and enjoyed her "supportive" customers. She was still
23 episodically irritable and having trouble sleeping. Dr. Howsepian indicated that Plaintiff was
24 doing better than he has seen her in quite a while. AR 229.

25      Plaintiff saw Ms. Post on December 4, 2002. She was tearful as she reported the death
26 of her father and the conflict with her step-mother. She reported that she had not been
27 aggressive. AR 224. Ms. Post indicated that this was an improvement, as Plaintiff was able to
28 verbalize her negative and positive comments about her father. AR 224. Rather than schedule a

follow-up visit, Ms. Post told Plaintiff to call to reschedule if she felt she needed to see her.  AR 224.

On December 10, 2002, State Agency physician Evelyn Aquino-Caro, M.D., completed a Mental Functional Capacity Assessment form.  She opined that Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, and in her ability to interact with the general public.  AR 197-198.  Dr. Aquino-Caro determined that Plaintiff could understand and remember in order to complete simple, repetitive tasks, but should avoid the general public.  AR 199.  Plaintiff could respond appropriately to hazards and changes in the workplace.  AR 199.

Dr. Aquino-Caro also determined that Plaintiff had mild restrictions in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace.  AR 211.

On February 27, 2003, Plaintiff saw Dr. Howsepian.  Plaintiff indicated that she was looking forward to resolution of her disability case and indicated that she may volunteer when it is over.  She was sleeping much better, and feeling less anxious and "more normal."  She was tolerating her medications well.  On mental status examination, she was "brighter and more stable than I have seen her" and was less anxious and less depressed.  She was more relaxed and calm.  He diagnosed "BPD/NPD," dysthymia, and anxiety not otherwise specified, all substantially improved.  Dr. Howsepian did not renew her anxiety medication because her anxiety was so well controlled.  AR 228.

Plaintiff saw Ms. Post in March 2003 and reported that her medications were working well and that she was sleeping well.  She indicated that she had some down days.  AR 223.

On June 6, 2003, Dr. Howsepian examined Plaintiff and indicated that she was "better than I have seen her" and significantly less anxious.  He diagnosed "BPD/NPD," anxiety not otherwise specified (improved), dysthymia (remission with Prozac 40), and bereavement (nearing resolution).  AR 227.

<u>ALJ's Findings</u>

1    The ALJ found that Plaintiff had the severe impairments of a dysthymic disorder and
2  anxiety disorder, not otherwise specified. AR 19. Plaintiff had no physical impairments. AR
3  19. The ALJ further determined that Plaintiff's allegation of disability and "self-proclaimed
4  functional limitations" were not supported by the objective medical evidence. AR 20. After
5  reviewing the medical evidence and testimony, the ALJ determined that Plaintiff had no
6  exertional impairments. AR 21. However, she could have only infrequent contact with the
7  public, and any interpersonal contact at the workplace should be superficial and incidental to the
8  work performed. AR 21. Plaintiff also had mild restrictions in activities of daily living, mild
9  to moderate difficulties in maintaining social functioning, and mild to moderate deficiencies of
10 concentration, persistence or pace. AR 21.

11   Based on the record, the ALJ concluded that Plaintiff's non-exertional limitations did
12 not significantly compromise her ability to perform work at all exertional levels. The ALJ
13 therefore relied upon the Medical-Vocational Guidelines ("Grids") to determine that Plaintiff
14 was not disabled. AR 22.

**SCOPE OF REVIEW**

16   Congress has provided a limited scope of judicial review of the Commissioner's decision
17 to deny benefits under the Act. In reviewing findings of fact with respect to such
18 determinations, the Court must determine whether the decision of the Commissioner is
19 supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than
20 a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a
21 preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such
22 relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
23 *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the
24 evidence that supports and the evidence that detracts from the Commissioner's conclusion.
25 *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making
26 findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*,
27 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's
28 determination that the claimant is not disabled if the Secretary applied the proper legal

standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3] Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (dysthymic disorder and anxiety disorder not otherwise specified) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform her past relevant work; (5) but retains the RFC to perform a significant number of jobs in the national economy. AR 22-23.

Plaintiff argues that the ALJ (1) erred in the RFC finding and (2) improperly relied on the Grids.

**DISCUSSION**

A.   RFC Finding

---

[3] All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

9

    Plaintiff argues that ALJ, while giving "substantial weight" to Dr. Howsepian's opinions, disregarded certain portions of Dr. Howsepian's report that indicated that Plaintiff was more limited than the RFC finding.  Specifically, Plaintiff points to Dr. Howsepian's September 2002, opinion that Plaintiff would be "unable to meet competitive standards" in working with others, completing a normal workday/workweek, responding appropriately to changes in a routine work setting, and dealing with work stresses.  AR 233.  She also points to Dr. Howsepian's opinion that Plaintiff was seriously limited her the ability to remember work-like procedures, maintain attention for two hour segments, and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  AR 233.

    RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment must be based on all of the relevant evidence in the record, including the effects of symptoms that are reasonably attributed to a medically determinable impairment.  SSR 96-8p.  In addition, the adjudicator "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe,'" because such limitations may be outcome determinative when considered in conjunction with limitations or restrictions resulting from other impairments.  SSR 96-8p.

    The ALJ reviewed the medical evidence and determined that Plaintiff had no exertional impairments.  However, she could have only infrequent contact with the public, and any interpersonal contact at the workplace should be superficial and incidental to the work performed.  AR 21.  Plaintiff also had mild restrictions in activities of daily living, mild to moderate difficulties in maintaining social functioning, and mild to moderate deficiencies of concentration, persistence or pace.  AR 21.  Based on this RFC, the ALJ applied the Grids to determine that Plaintiff was not disabled.

    Plaintiff's argument focuses mainly on the ALJ's failure to adopt certain limitations found by Dr. Howsepian despite the ALJ's finding that his opinions were entitled to

1  substantial weight. AR 20. Plaintiff correctly points out that while the ALJ reviewed and
2  adopted Dr. Howsepian's opinion that Plaintiff could perform routine, repetitive, simple, entry-
3  level jobs, and should not work around people for any length of time, the ALJ did not adopt Dr.
4  Howsepian's more restrictive limitations. AR 19, 20. These somewhat inconsistent opinions
5  were set forth in the same September 13, 2002, Mental Impairment Questionnaire. AR 233,
6  236.

7        First and foremost, the ALJ is responsible for resolving conflicts in the medical
8  evidence. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995); *Magallanes v. Bowen*, 881
9  F.2d 747, 750 (9th Cir. 1989). Indeed, the Court must uphold the ALJ's decision where the
10 evidence is susceptible to more than one rational interpretation. *Magallanes,* 881 F.2d at 750.

12       To the extent Dr. Howsepian's statements are contradictory, the ALJ was entitled to
13 adopt his finding that Plaintiff could perform routine, repetitive, simple, entry-level positions
14 without exacerbating her symptoms. AR 236. As will be explained in more detail below, this
15 was a rational conclusion supported by the objective medical evidence.

16       Second, the ALJ need not believe everything a physician sets forth, and may accept all,
17 some, or none of the physician's opinions. *Magallanes,* 881 F.2d at 753-754. In adopting Dr.
18 Howsepian's opinion, the ALJ explained:

> In the instant case, on September 13, 2002, Dr. Howsepian believed the claimant could perform simple, repetitive tasks in a work setting that does not require her to work in coordination with or proximity to others. The doctor did not believe the performance of simple work would exacerbate the claimant's mental problems. Moreover, since the above date, the doctor's own progress notes show the claimant has made overall progress in her ability to sustain gainful activity. The undersigned concludes the medical opinions of Dr. Howsepian are entitled to substantial weight because they are consistent with the doctor's own findings and the general weight of the evidence of record.

AR 20.

      The ALJ's conclusion is well-supported by substantial evidence. Almost all of Dr. Howsepian's restrictive opinions were set forth in a questionnaire-style form where answers were indicated by checking a level of severity for each impairment. When Dr. Howsepian gave his own thoughts as to Plaintiff's condition, he stated that she could not work "at a level commensurate with her training- especially working around other people," for any viable

length of time. AR 237. Crediting this opinion, the ALJ found that Plaintiff, a college graduate, could perform a significant number of unskilled jobs at all exertional levels, but could only have infrequent contact with the public and superficial contact with supervisors and co-workers. AR 21, 22.

Additionally, as the ALJ noted, this conclusion was supported by Dr. Howsepian's own treatment notes. Subsequent to the September 2002 questionnaire, Dr. Howsepian made several notations that Plaintiff was better than he had previously seen her. AR 227-229. On February 27, 2003, Plaintiff was sleeping much better, and feeling less anxious and "more normal." She was tolerating her medications well. On mental status examination, she was "brighter and more stable than [Dr. Howsepian has] seen her" and was less anxious and less depressed. She was more relaxed and calm. He diagnosed "BPD/NPD," dysthymia, and anxiety not otherwise specified, all substantially improved, and did not renew her anxiety medication because her anxiety was so well controlled. AR 228. Similarly, in June 2003, approximately three months before the hearing, Dr. Howsepian examined Plaintiff and indicated that she was "better than I have seen her" and significantly less anxious. He diagnosed "BPD/NPD," anxiety not otherwise specified (improved), dysthymia (remission with Prozac 40), and bereavement (nearing resolution). AR 227.

Given the substantial improvement noted by Dr. Howsepian since his September 2002 assessment, the ALJ's interpretation of his assessment was proper. This interpretation was also supported by the other medical evidence. In June 2002, State Agency physician Dr. Garcia determined that Plaintiff could understand and remember very short and simple instructions, and could maintain attention and concentration for two hour increments and perform at a consistent pace. AR 154. Although she could not interact appropriately with the general public, she could interact appropriately with co-workers and supervisors and respond appropriately to hazards and changes in the workplace. AR 154. Similarly, in December 2002, State Agency physician Dr. Aquino-Caro opined that Plaintiff could understand and remember in order to complete simple, repetitive tasks, but should avoid the general public. AR 199. Plaintiff could respond appropriately to hazards and changes in the workplace. AR 199. In

1  March 2003, Plaintiff reported that although she had some down days, her medications were
2  working well and she was sleeping well.  AR 223.  Finally, as Respondent notes, Plaintiff's
3  own actions supported the ALJ's finding that Plaintiff could perform work, as Plaintiff had
4  applied for numerous jobs while she was allegedly disabled.  AR 194.

5  B.   Reliance on the Grids

6  Plaintiff asserts that the ALJ improperly relied upon the Grids in determining that
7  Plaintiff could perform a significant number of unskilled jobs.  Plaintiff contends that the ALJ
8  should have consulted a VE to determine whether the non-exertional limitations set forth in the
9  RFC precluded Plaintiff from performing alternate work.

10  In general, where a claimant suffers only from exertional limitations, the ALJ may apply
11  the Grids at step five to match the claimant with the appropriate work.  *Reddick v. Chater*, 157
12  F.3d 715, 729 (9th Cir. 1998).  The ALJ may apply the Grids in lieu of taking VE testimony
13  only when the Grids accurately and completely describe the claimant's abilities and limitations.
14  *Id.* (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).  If a claimant's non-exertional
15  limitations "significantly limit the range of work" he can perform, mechanical application of
16  the grids is inappropriate and a vocational expert would be needed to describe what, if any, jobs
17  existed in the national economy that the claimant could perform.  *Desrosiers v. Secretary of*
18  *Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988).  The determination of whether
19  a non-exertional limitation significantly limits the range of work the claimant is able to perform
20  is left to the ALJ.  *Id.*

21  Here, the ALJ found that Plaintiff had only non-exertional impairments relating to
22  Plaintiff's limited interaction with co-workers, supervisors and the general public.  AR 21.  AR
23  21.  The ALJ explained that she gave Plaintiff the benefit of the doubt in finding that she could
24  not perform her past relevant work.  AR 21.  The ALJ then explained that Plaintiff's non-
25  exertional limitations did not significantly compromise her ability to perform work at all
26  exertional levels.  AR 22.  The ALJ therefore relied on Section 204.00 of the Grids to find
27  Plaintiff not disabled.

28

The ALJ properly relied on the Grids. Pursuant to *Desrosiers*, the ALJ determined that Plaintiff's non-exertional limitations, where Plaintiff could perform work at all exertional levels, did not significantly erode the occupational base to preclude reliance on the Grids. Such a conclusion is certainly logical given that Plaintiff could perform unskilled work at *every* exertional level.

Plaintiff argues that her social interaction restrictions and her mild to moderate deficiencies in concentration, persistence or pace significantly compromise her ability to perform work and preclude application of the Grids. However, the ALJ found Plaintiff able to perform all exertional levels of *unskilled* work, which by definition, does not generally involve dealing with people. SSR 85-15 ("these jobs ordinarily involve dealing primarily with objects, rather than with data or people"); 20 C.F.R. § 404.1568 (explaining that "[f]or example, . . . jobs [are] unskilled if the primary duties are handling, feeding and offbearing . . ., or machine tending" and that "skilled jobs may require dealing with people."). Therefore, based on the nature of Plaintiff's non-exertional impairments and the ALJ's finding that she could perform unskilled jobs at all exertional levels, the ALJ's use of the Grids, was appropriate.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Jo Anne B. Barnhart, Commissioner of Social Security and against Plaintiff, Leslie K. Wasson.

IT IS SO ORDERED.

Dated:   **September 15, 2005**             **/s/ Dennis L. Beck**
3b142a                                                     UNITED STATES MAGISTRATE JUDGE